**UNITED STATES of America**

v.

**Michael R. MILKEN, Lowell J. Milken, and Bruce L. Newberg, Defendants.**

**No. SS 89 Cr. 41 (KMW).**

United States District Court, S.D. New York.

Dec. 13, 1990.

FATICO FINDINGS

KIMBA M. WOOD, District Judge.

I. *Introduction*

On April 24, 1990, Michael Milken pled guilty to a six-count felony information charging him with conspiracy, securities fraud, mail fraud, market manipulation and tax fraud. On September 10, 1990, defen-

dant filed its Sentencing Memorandum ("DSM") with the court; on September 13, 1990, the government filed its Sentencing Memorandum ("GSM"). In addition, the parties filed Reply Memoranda. In these sentencing memoranda, the parties debate the defendant's character, disputing whether defendant engaged in other misconduct alleged by the government.

On September 27, 1990, the court announced that it would conduct limited hearings pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir.1979) *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980), with respect to a limited amount of alleged additional misconduct, in order to allow the court to have as full a picture as possible of Michael Milken's character in sentencing him on the six counts to which he pled guilty.

In conjunction with the hearing, the court allowed defendant liberal discovery, granting defendant access to materials he might not have had even in a trial setting and granting defendant access to materials earlier in the proceedings than he might have had in a trial. The court also granted continuances when requested by the parties. While the court advised the parties that each side would have twenty hours in which to present its evidence, the court stated that it would allow more time if doing so would assist the court in assessing Michael Milken's character. However, neither party used all of its allotted time, and each indicated to the court that it did not wish to present any more live testimony. (*See* Transcript of Telephone Conference, November 2, 1990).

The court's findings indicate the disputed conduct that the court took into account in sentencing Michael Milken. This is the only disputed conduct the court considered in its sentencing decision. The court considered no allegations other than those mentioned in these findings, even though the government introduced evidence in support of other allegations. For example, the government alleged that Michael Milken parked stock with Columbia Savings and Loan (GSM at 123–144), and introduced testimony at the hearing to attempt to support this allegation. (Tr. 1206, 1267–68, 1277 [Dahl]). However, the government represented to the court that it was introducing this evidence only as background for its presentation of evidence supporting its Caesars World insider trading allegations. (Tr. 1161–1163). Therefore, the court did not consider this evidence in sentencing Michael Milken.

In accordance with the Second Circuit's rulings in *Fatico* and *United States v. Lee*, 818 F.2d 1052 (2d Cir.), *cert. denied*, 484 U.S. 956, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987), the court has used a preponderance of the evidence standard in assessing the government's allegations. However, when the court considered the testimony of a witness whose testimony was adverse to defendant, the court gave no weight to the testimony unless the court was firmly convinced that the witness was credible.

Although *Fatico* findings need not be detailed, given that the parties have made very detailed submissions, I will deal with their arguments in similar detail.

## II. *Attempts to Obstruct Justice*

### A. The Ledger Book re. Unlawful Transactions with Solomon

A key document disappeared between the time subpoenas were served on Drexel Burnham Lambert, Michael Milken and others on November 14, 1986, and the time the High Yield Bond Department ("HYBD") complied with the Government subpoena—the blue ledger book containing entries evidencing the unlawful agreement between David Solomon and Michael Milken regarding the 1985 tax trades and the Finsbury misappropriation arrangement to which Milken pled guilty. (Tr. at 728–31 [Peizer]). Terren Peizer, a young, former protege of Michael Milken, testified that Michael Milken came to him on November 17, 1986, the Monday after Drexel was served with a subpoena, asked whether Peizer still had the book (Tr. 728, 757), and upon learning that he did, told Peizer to

give it to Lorraine Spurge. (Tr. 728, 757).[1] Peizer testified that he gave it to Spurge on November 18, in the kitchenette off the trading room, where he said to her, next to the sink as he turned on water to muffle the sound, "Michael asked me to give this to you" (Tr. 730–731). Peizer also testified that Michael Milken and Lorraine Spurge had an "extremely close" working relationship, and that they were close on a personal level as well. (Tr. 730).

Defense counsel offered the grand jury testimony of Lorraine Spurge, which defense counsel had not yet seen, but had learned from Ms. Spurge's counsel was exculpatory. (Tr. 839). Because the prosecutors in this case wish to avoid seeing Ms. Spurge's grand jury testimony in order to avoid *Kastigar v. U.S.*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 problems in prosecuting her in the future (Tr. 840), the court reviewed the Spurge grand jury testimony *in camera*, rather than permit it to become public; defense counsel was permitted to review the Spurge testimony in the United States Attorney's office. The court is setting forth in a separate, sealed portion of this opinion (Appendix A hereto) available only to defense counsel, the court's reasons for finding Ms. Spurge's grand jury testimony unreliable in comparison with Mr. Peizer's testimony. The court finds that in light of the need to insulate prosecutors in this case from the substance of Ms. Spurge's grand jury testimony in order to avoid *Kastigar* problems in any future prosecution of Ms. Spurge, sealing of Appendix A hereto is essential to preserve higher values and is narrowly tailored to preserve that interest.

The court has taken note of defense counsel's request that the court ask the prosecutors to grant Ms. Spurge immunity for the purpose of testifying live, so that the court could assess her demeanor while testifying. The court denied that request for two reasons: (1) before the court reviewed the Spurge grand jury testimony,

the prosecutors stated their strong interest in prosecuting Ms. Spurge and their unwillingness to grant her use immunity, (Tr. 1308–09) and (2) the factors affecting Ms. Spurge's credibility that are noted in Appendix A hereto will be unaffected by her live testimony.

Defendant claims that Peizer's credibility is undercut by the facts (1) that he testified pursuant to a grant of immunity from both criminal prosecution and SEC sanction, (2) that he testified that certain brief notations in the Solomon reconciliation sheet (GX 97) were in Michael Milken's handwriting, that defendant contends were not his handwriting (DPHM at 39 n. 34) (Tr. 745–49) (DX 80), (3) that he claimed to see Lowell Milken confer with Michael Milken on the day Ivan Boesky's agreement to cooperate with the Government was announced, November 14, 1986, at a time when Lowell Milken was at a doctor's appointment (Tr. 727, 749–52), and (4) that on May 17, 1988, Mr. Peizer signed an affidavit that he complied with the Drexel subpoena when he had withheld one responsive document (DX 82) (Tr. 745).

Although the existence of non-prosecution agreements is relevant to assessing Mr. Peizer's credibility, it is only one factor the court must weigh along with others. In particular, the court paid close attention to Mr. Peizer's demeanor and manner of response during his testimony, including when he was challenged on cross-examination regarding whether notations were in Michael Milken's handwriting, the timing of when he saw Lowell Milken confer with Michael Milken and the fact that he previously signed a false affidavit. Mr. Peizer's demeanor and manner of response convinced the court that if Mr. Peizer mis-identified handwriting as that of Michael Milken,[2] it was an innocent mistake; that his placing an encounter between Michael Milken and Lowell Milken at "soon after" the announcement of Boesky's cooperation, which I will assume was incorrect, was an innocent mistake in recalling how much

---

1. Although defendant contends that Peizer's testimony on direct examination regarding this event differs from his testimony on cross-examination, the differences are not material ones.

2. In a telephone conference call with the court on November 20, 1990, the Government conceded that the handwriting in question is "probably" not Michael Milken's.

time elapsed between the two events; and that his previously having sworn to having made complete document production when he had withheld one document is explained as having occurred before Mr. Peizer made the decision to disclose wrongdoing that implicated his boss, Michael Milken, and himself.

The court finds that Peizer testified forthrightly, carefully and credibly, and the court finds, from Peizer's testimony, that Michael Milken directed Peizer to give the ledger book containing evidence of Michael Milken's unlawful dealing with Solomon to Lorraine Spurge. It can reasonably be inferred from the fact that Peizer gave the ledger to Spurge at Michael Milken's direction, Lorraine Spurge's close personal and professional relationship with Michael Milken, and the ledger's subsequent disappearance that the purpose of Michael Milken's giving that direction to Peizer was to keep the ledger out of the Government's hands.

Defendant argues that such an inference is unreasonable because Michael Milken did not ask Peizer to destroy Peizer's own desk notebook containing similar information about unlawful Solomon transactions. Because defendant has offered no evidence in support of his suggestion that Milken had that second notebook in mind at the time in question, the court will not alter its conclusion based on speculation that Milken had that second notebook in mind.

Although the court needs no support other than the testimony of Terren Peizer referred to above to conclude that Michael Milken's purpose in telling Peizer to give the ledger to Spurge was to keep the ledger out of the Government's hands, support for it can be found in the fact that Milken evidenced at other times referred to *infra* a consciousness of the fact that his department's documents could incriminate him, and signalled to Peizer and James Dahl the advisability of not producing documents pursuant to Government subpoena.

B. Conversation with James Dahl re. Subpoenas

█ James Dahl, whom the court found to be highly credible, testified that he was at home on Sunday, November 16, 1986, when he received a call from Michael Milken, who said he would like Dahl to come in to the office and that there were some things he wanted to go over with Dahl (Tr. 1222). Dahl went to the office, where he sat at his desk for two hours, in the same room where Michael Milken was sitting at *his* desk. *Id.* Dahl became a little impatient and wanted to go home. *Id.* Dahl then said to Milken "Mike, if there is something you want to talk to me about, let's do it because I am out of here soon." *Id.* At that point Milken went to the men's room, and walked over to the sink, turned on the water, started washing his hands, leaned over and said to Dahl "there haven't been any subpoenas issued and whatever you need to do, do it," turned off the water, and looked to Dahl for a response. *Id.* Dahl said okay, walked out and went home. *Id.* At that time, Dahl had received no subpoena to produce documents; Drexel and Mr. Milken had received subpoenas on November 14, 1986. (Tr. 1223).

Defendant argues (1) Dahl's recollection is cast into doubt by the fact that subpoenas were served on Drexel and Michael Milken on November 14, 1986, and that service of subpoenas was reported in newspapers on November 15, 1986; (2) Dahl did not interpret Michael Milken's alleged statements as asking him to destroy documents, never had any further discussion with Michael Milken on the subject, and never destroyed any documents; and (3) Dahl was not a reliable witness given that many of his recollections of the Caesars World transaction—the primary subject of his testimony—were contradicted by documentary evidence.

It is possible that when Michael Milken said "there haven't been any subpoenas issued," he meant that no subpoenas had been issued to Dahl and certain other employees; although the subpoena served on Drexel would require production of any responsive documents in Dahl's possession, Milken could have been assuming otherwise, which would explain his making a distinction between a subpoena directed to

Dahl and one directed to Drexel. Alternatively, Dahl may have misheard a word or two (given that Milken was speaking over running water), and Milken may have said "(t)here have been subpoenas issued." Either scenario is plausible. The more important point is that Dahl testified carefully and deliberately, and it was clear to the court that he had a vivid recollection of Michael Milken giving instructions to Dahl to do whatever he needed to do in view of "subpoenas." Milken thus called a trusted subordinate to the office on a Sunday for the sole purpose of telling him, in such a way that no one else could overhear, that he should do whatever he needed to do in view of the likelihood or the actuality of subpoenas being served.

Defense counsel also suggested that one can infer from Michael Milken's words, which they do not concede were spoken, merely that Dahl should do whatever is necessary to preserve client confidence in Drexel during the investigation. The setting in which these events took place belies that suggestion. Such an innocent message, even if it needed to be conveyed on a Sunday, could have been conveyed on the telephone or in the trading room, rather than in the Drexel office men's room, over running water. In fact, as the government points out, that message could even have been conveyed in the United States Attorney's office.

Finally, defendant suggests that because Dahl failed to remember that the purchase of Caesars World bonds from the Colonial High Yield Fund was part of a swap, this court should not credit his testimony regarding his Sunday afternoon conversation with Michael Milken. As I have discussed, I found Dahl to be a credible, earnest witness. Dahl's failure to recall certain details of the Caesars World telephone calls does not discredit his testimony regarding his Sunday meeting with Milken. In July 1983, Dahl telephoned several of his accounts daily and sometimes several times a day attempting to buy Caesars World bonds. (Tr. 1202–1204, 1209). Thus, it is likely that on July 14, 1983 Dahl telephoned several customers and spoke to them about

Caesars World. The transaction with Colonial High Yield Fund took place seven years before this hearing. It is not surprising that, given the complexity of the transaction and the sometimes frenzied atmosphere of the trading floor, the passage of time has dimmed Dahl's memory for detail. I do not find that his failure to recall certain details of his Caesars World telephone calls renders Dahl's testimony regarding his men's room conversation with Michael Milken unreliable.

From the sequence of events testified to by Dahl, I conclude that Michael Milken directed Dahl to come into the office that Sunday for the sole purpose of signalling to him, clandestinely, the advisability of removing or destroying documents damaging to Michael Milken, Drexel Burnham Lambert or Dahl himself that were likely to be called for in a government subpoena that Milken anticipated might be served on Dahl in the future, or called for in subpoenas already served on Drexel and Michael Milken.

### C. Conversation with Terren Peizer re. Subpoena

 Michael Milken also signalled to Peizer the advisability of removing or destroying documents responsive to a government subpoena. While Peizer was looking through his files for documents responsive to a government subpoena, Milken made a comment that Peizer took to mean that Milken was asking what Peizer was doing. (Tr. 769–770). When Peizer told Milken that Peizer was looking for documents called for by the subpoena, Milken said to Peizer with a smile, "glibly," as Milken opened an empty drawer, words to the effect "if you don't have them, you can't provide them." (Tr. 770 [Peizer]). The court believes that even if this were the only conversation Milken had with a subordinate regarding subpoenas, it would be sufficient to permit the court to conclude that Michael Milken was pointing out to Peizer the advisability of Peizer removing or destroying documents responsive to the

subpoena.[3] Viewing Peizer's testimony in conjunction with the similar conversation that Michael Milken had with Dahl bolsters this conclusion.

In attempting to counter the allegations in Dahl's and Peizer's testimony, defendant relies on the fact that on the stand, Dahl said he did not know what Michael Milken meant in these conversations (Tr. 1280–81), and that Peizer, when asked by defense counsel "Did you construe anything that Michael Milken said to you when you were going through your drawer as meaning you ought to throw out the documents?" responded "I don't think one can necessarily make that assumption. I guess you could look at his comment in a number of ways and I am not sure, you know—I can't say he was telling me to throw out documents" (Tr. 771). The court took note of the fact that by their demeanor and manner of responding to questions, both witnesses appeared to be deeply reluctant to testify against Michael Milken, and appeared to testify only to that to which the facts forced them to testify. Their reticence in responding to these questions appeared to stem more from an attempt to do whatever they could to avoid drawing inferences that could hurt their former mentor and benefactor, than from confusion about what Milken was communicating. I believe they both bent over backward during their testimony to avoid drawing the only reasonable inference that can be drawn from these events. Even if that is not true, and Dahl and Peizer did not know what Michael Milken was saying to them, the court can determine independently, from the sequence of events, the settings, and Michael Milken's words, what Michael Milken was attempting to communicate, and the court does so here. The fact that Dahl and Peizer apparently destroyed no documents, as argued by defendant, does not prevent the court from considering, as relevant to Michael Milken's character, his *attempts* to have his subordinates remove or destroy documents responsive to the Government subpoena. The court notes that apart from the ledger Peizer gave to Spurge (which delivery probably *pre*-dated Peizer's desk search for responsive documents), Peizer did remove one responsive document from Drexel, and turned it over to the Government only when Peizer began to cooperate.

■ Defendant argues further that because there is no testimony that Michael Milken specifically asked a witness to destroy a particular document, or to give false testimony, or to withhold particular evidence from the Government, the court should conclude that Michael Milken made no effort to obstruct justice. (DPHM at 37). Such a conclusion would be at variance with the facts. Michael Milken's pattern of wrongdoing, as shown in the crimes to which he pled guilty, is to step just over the line into unlawful conduct, and to do so in a way that preserves his "deniability" and minimizes the risk of detection. His clandestine and subtle message to Dahl, and his slightly veiled message to Peizer, are characteristic of this way of operating. The court will not conclude that because Michael Milken chose to be subtle rather than blatant, no wrongdoing occurred.

## III. *Storer Communications, Inc.*

■ In 1985, Kohlberg, Kravis, Roberts & Co. ("KKR") acquired Storer Communications, Inc. ("Storer") in what was then the largest leveraged buy-out ("LBO") ever effected. Drexel structured the transaction and marketed several different types of securities in order to raise the $1.465 billion KKR needed to complete the buyout. Of the money Drexel agreed to raise for the transaction, $1.2 billion was in the form of debt securities issued by SCI Holdings. In addition, $261 million in "pay-in-kind" ("PIK") preferred stock ("the Preferred"), which paid dividends in additional stock rather than cash, was issued by SCIPSCO, Inc., a subsidiary of SCI Holdings. Finally, Drexel agreed to raise $5 million through the sale of limited partnership interests in SCI Equity Associates, L.P., which held warrants to purchase 32% of the common stock of SCI Holdings.

---

**3.** The court does not draw from this occurrence the conclusion anticipated in defendant's post-hearing memorandum ("DPHM") at 37 that Michael Milken himself destroyed documents.

The Preferred was among the first pay-in-kind preferred stocks to be sold publicly through an underwriting and was thus difficult to market. (Tr. 525–29 [Connors]). As a result, in July 1985, members of Drexel, principally Peter Ackerman, told Theodore Ammon, a KKR partner, that the equity warrants should be detached from particular securities and offered separately as a "sweetener" to market the securities, especially the Preferred. (Tr. 780–82). KKR agreed to do so. Several months later, Michael Milken called Ammon and expressed his view that KKR should reduce the price of the warrants. According to Ammon, Milken stated that "the buyers of the securities felt that the money that they were putting up to buy securities was sufficient and that they should get warrants to acquire the equity in SCI Associates at a reduced price from the 10 million dollars." (Tr. 793 [Ammon]). Milken gave no indication as to the identity of these buyers, and did not indicate that among the potential buyers were Milken, Drexel, and their associates. (Tr. 794–95 [Ammon]). Ammon understood that Milken was referring to "the buyers of the zeros, the senior subordinated notes, the preferred stock." (Tr. 795). Similarly, it was Ammon's "understanding that every effort would be made to sell into the marketplace to third parties as much of the financing as possible, and presumably the full 1 billion 461 would be sold to third parties." (Tr. 796).

The Government argues that KKR made this equity available to Drexel as a way of inducing *third-party purchasers not affiliated with Drexel* to purchase the Preferred and other SCI securities. Drexel, the government alleges, did not in fact use the warrants to sell the Preferred. Rather, Drexel allocated them to Drexel-affiliated partnerships, in which Michael and Lowell Milken and their children owned sizeable interests, and offered the warrants to certain employees of Drexel clients to curry their favor. In support of this argument, the Government points to the fact that many of Drexel's salesmen selling the Storer securities, such as Jim Dahl, Terren Peizer and Tom Connors, were unaware that equity was even available (Tr. 547, 1221, 716, 1182, 1183), and that equity was offered primarily to Michael Milken-affiliated entities such as the partnerships and Atlantic Capital Corporation.

Defendant disagrees with the Government's interpretation of these events. He argues that it was within Drexel's discretion to use the equity as it saw fit in marketing the Storer securities, and that in the sales of the warrants to the partnerships and others, it did just that. Michael Milken points to the fact that KKR representatives were present at "road shows" when some potential investors who inquired about equity were told that none was available. (Tr. 663–64, 678 [Hayes]; Tr. 819–20 [Ammon]). Thus, defendant argues that KKR, by its failure to object, evidenced its awareness that Drexel had no obligation to offer the warrants to any particular purchasers. Further, defendant points to the fact that Fred Joseph gave Milken his approval, after being told by Milken that the partnerships were purchasing equity when they bought the Preferred. (Tr. 1039)

In November 1985, the partnerships agreed to purchase $154 million of the $261 million Preferred offered. The parties dispute the nature of this purchase. The Government alleges that Michael Milken "nominally committed the High Yield Partnerships to buy substantial amounts of the the PIK Preferred so that he and his associates could take down 82% of the equity." (GPHM at 14). The government points to the fact that while the partnerships retained their share of the equity until they earned approximately $270 million in profits in late 1988, the partnerships shed their Preferred shortly after they purchased it, selling off a total of $88 million to Solomon Asset Management clients, Columbia Savings and Loan, Triangle Industries, and Kindercare prior to the transaction closing on December 5, 1985, and selling off the remaining $66 million to Drexel within 4 days after the transaction closed. (Tr. 876–77, GX 58, 60).

Defendant contends that the partnerships' commitment to the Preferred was not only real, it was crucial to selling all of

the Preferred necessary and winning the Storer board's approval of the transaction. Defendant argues that the partnerships agreed to purchase the Preferred, which was difficult to sell, and ran enormous risk at a time when Drexel was unwilling to make such a risky commitment. Defendant claims that the timing of the partnerships' commitment was critical; it allowed KKR to present the completed financing to the Storer board and win the board's approval.

### A. Risk-bearing by Drexel–Affiliated Partnerships

I find that the partnerships agreed to purchase the Preferred and bore whatever risk such a purchase entailed. Michael Milken received the approval of Fred Joseph before purchasing the Preferred for the partnerships; indeed, Joseph expressed his satisfaction that the partnerships were willing to make the purchase that Drexel was unwilling to risk. (Tr. 1039). The partnerships' purchase of the Preferred appeared on Drexel's books and records, available for review by Drexel officials. (Tr. 1075–76 [Joseph]). While the partnerships may have been motivated in their purchases of the Preferred solely by the desire to obtain the equity, they nonetheless bore some risk and helped KKR do what it was trying to do—get the financing sold and the deal approved on a timely basis.

### B. Milken's Failure to Disclose Information to KKR

This court's finding that the Drexel employee partnerships purchase of the PIK Preferred was in fact a real commitment—albeit one that turned out to be short-term—does not wholly absolve Michael Milken from any wrongdoing in connection with this transaction. The government alleges that there were at least two types of non-disclosure by Milken: (1) a failure to disclose in a variety of public filings the extent of the SCI equity interests held by the partnerships; and (2) an effort to deceive KKR through "affirmatively misleading statements" regarding the need for an equity sweetener. (*See* GPHM at 19–20). I will address these allegations in turn.

The government contends that Drexel should have disclosed in the prospectus the fact that the High Yield Partnerships garnered for themselves 82% of the equity sweeteners available in the transaction and that this enormous equity allocation constituted a "prearranged compensation device" (GPHM at 17), requiring disclosure. The government further alleges that the representations in KKR's application on behalf of SCI Equity Associates for an exemption from the Investment Company Act were wrong in that some of the purchasers acquired more than 10% of the limited partnership interests. (GX 55 at 12–13). Defense counsel counters that even if the law required such disclosure, "it was indisputably Drexel's position and policy ... that purchases by employee partnerships of securities which Drexel was offering need not be disclosed." (DPHM at 15). The testimony of Fred Joseph supports this position. On cross-examination he testified that Drexel's policy did not require the disclosure of purchases of securities by employee-related partnerships of securities issued or underwritten by Drexel. In fact, in 1988, Joseph mentioned this policy in his testimony to a congressional committee examining issues related to Drexel's employee-related partnerships. (*See* DX 135 at 54–56).

The court finds this argument convincing, at least as it pertains to Milken's role in the disclosure. Whether or not there exists a duty to disclose in the public filings the equity interests held by the partnerships, it was Drexel's policy not to disclose such information. The court is not willing to enhance Milken's sentence based on Drexel having followed such a policy, in the absence of any evidence that Milken had a role in formulating that policy.

The second type of non-disclosure the government alleges is more problematic than the first. Milken never told KKR that most of the equity warrants (82%) were being purchased by Milken, his family and associates. Any disclosure of this, the government alleges, would have resulted in

less equity for Milken and a reduction, or at least renegotiation by KKR, of Drexel's fee. In response to this allegation, defendant points to Ammon's testimony that KKR would have gone ahead with the transaction anyway, even if it knew that Milken would procure most of the warrants himself. (Tr. 834). Defendant also argues that had KKR wanted to place restrictions on Drexel's right to keep for itself or its employees any equity it did not sell, it could have bargained for such restrictions (and did so in several subsequent transactions).

Ammon testified that "had we known that warrants were going to Drexel or Drexel-affiliated entities, we would have wanted to discuss that in the context of the underwriting commissions that were being paid to Drexel." (Tr. 797). In later deals KKR engaged in with Drexel in which it allowed Drexel and related entities to keep the equity they did not use for marketing purposes, KKR granted this permission as part of its written compensation agreements with Drexel. In other words, when KKR knew about Drexel's desire to retain a certain amount of equity for itself, KKR chose to make that part of its compensation negotiations with Drexel. (*See* Tr. 832–34; 837). Although it is true that KKR *could* have initiated a discussion of whether Drexel or Milken wanted the right to keep the warrants, there is no evidence that KKR had any reason to believe that Drexel or Milken were even contemplating retaining the warrants, and Milken chose not to disclose that fact.

The court accepts as plausible Mr. Ammon's speculation that KKR would have gone ahead with the transaction even if it had been informed that Milken and his affiliates would keep most of the warrants for themselves. KKR would have tried to do so, however, on different terms, either by renegotiating Drexel's fees to take into account the low price of the warrants as compared to their upside potential (*see, e.g.,* Tr. 626–27 [Bayse]; Tr. 1131–32 [Grassgreen]), or by suggesting other approaches to marketing the securities in the financing that better accommodated KKR's desire to achieve a widespread distribution of the warrants. (Tr. 797–98 [Ammon]). KKR not only wanted to secure the financing for this particular deal on the most favorable possible terms, they also tried to look down the road to the next deal. "Customer relations" were thus a consideration for KKR; it sought to market new deals to the satisfied buyers of securities from its past deals. For this reason, Ammon testified, "we wanted as wide a distribution of the securities, as well as the equity, as possible." (Tr. at 797).

I find that Milken deliberately failed to disclose to KKR the fact that Milken and his family and associates were keeping most of the warrants themselves, and that his reason for doing so was to avoid having to renegotiate Drexel's fees with Ammon or having to discuss with Ammon whether other steps should be taken to market the securities to third parties. I will take this nondisclosure into account in assessing Mr. Milken's character.[4]

### 1. Conclusion

In sum, the court will not enhance Milken's sentence on the basis of any lack of disclosure in public documents related to the Storer transaction. The court does find, however, that Milken failed to disclose to KKR the allocation of the equity component of the transaction and that he did so

---

**4.** There is some evidence to support an allegation of even further deception on the part of Milken. According to Milken's attorney, by July of 1985 Milken had committed to be the *de facto* underwriter—the buyer of last resort—for the $261 million of PIK Preferred in the transaction. (Tr. 567). This fact, if true, would establish that no reduction in the warrant price was needed to ensure that Drexel could finalize the financing, and that Milken was lying when he told Ammon otherwise in October. It would also explain why three of the leading salesmen in the High Yield Department never knew that they could use equity to market the preferred— Michael Milken, as the buyer of last resort, who knew that Fred Joseph had endorsed the notion that the equity would go along with the Preferred, had an incentive to keep the equity for himself. In view of the fact that the record on this point is fairly thin, and in view of the fact that the court has ample other evidence regarding defendant's character, the court will not rely upon these allegedly deceptive acts in sentencing defendant.

for improper purposes. Accordingly, the court will take this conduct into consideration in assessing his character.

### C. The MacPherson Partnership

#### 1. Background

■ The government's remaining allegations concerning the Storer transaction center on the sale of interests in SCI Equity to various fund managers and corporate executives, all of whose employers were important Drexel clients.

One of the major purchasers of the PIK Preferred was a corporation known as Atlantic Capital, which held a 16% interest in SCI Equity. On December 9, 1985, soon after the Storer transaction closed, Atlantic Capital sold its $30.5 million in PIK Preferreds back to Drexel at the offering price. Drexel also required Atlantic Capital to sell back its equity interest along with the Preferred; on December 10, Atlantic executed an agreement granting to Drexel an option either to purchase Atlantic's SCI Equity interests directly, or indirectly through a limited partnership which would then sell partnership interests to Drexel. The MacPherson partnership was established for this purpose, and became the entity that held the warrants repurchased from Atlantic Capital. Drexel, however, never repurchased the SCI Equity interests of Atlantic Capital. Instead, through the MacPherson partnership, these equity interests went to certain individual investors, many of whom held positions as fiduciaries of significant Drexel clients or customers. The parties dispute what inferences the court should draw from this allocation of the MacPherson interests.

The government alleges that Milken handpicked these individuals to receive this investment opportunity in MacPherson. None of the individual MacPherson investors had purchased any of the PIK Preferred, and only a few had invested in the other debt securities. At the same time, the government points out, the individual investors' employers had purchased over $176 million of the Preferred and, in several cases, large amounts of the other securities offered as part of the Storer financing. The government infers from this evidence and the testimony of several of the individual investors that "Milken offered the MacPherson opportunity to portfolio managers to reward them both for buying the PIK Preferreds and for their overall loyalty to Drexel, and to encourage them to do additional business with Drexel." (GPHM at 23). This effort, the government contends, violates a number of federal criminal statutes.

Defendant does not contest most of the facts underlying these allegations. Instead, he argues that there was nothing illegal or improper about the fund managers' purchase of the MacPherson partnership interests. Those institutions that bought the Preferred did so based on the merits of the transaction, defendant argues, not because those responsible for the purchase were induced by the offer of the MacPherson interests. Defendant further contends that providing the opportunity to invest in the MacPherson partnership to Drexel clients and customers was not improper or illegal as long as the investment was not offered on "favored" terms. Following from this premise, defendant maintains that because the value of the MacPherson investment was so difficult to ascertain and the investment so speculative, it is impossible to determine the market price of the investment.[5] Therefore,

---

5. Investors sought the warrants because they were a way of sharing in the potential rise in value of the company at a nominal cost. The warrants had enormous upside potential. Benalder Bayse testified that he believed his investment in the warrants would turn out to be "either a strikeout or a home run," and that "it would be worth nothing or it could be worth several times my investment." (Tr. 626).

Bayse's testimony also points out the highly speculative nature of any investment in the war-

rants. They represented the most junior layer beneath some $2 billion in debt. (Tr. 680 [Hayes]). The warrants had only restricted marketability (Tr. at 681); were held in a partnership controlled by KKR, and thus not traded on an exchange; and were subject to an unusual capital call provision pursuant to which the warrant holders could be forced to exercise the warrant against their will. (Tr. 1022; GX 54; DX 132 at 5; DPHM at 20).

defendant continues, the government has failed to meet its burden of showing that the investment was offered at a "bargain price." (DPHM at 17).

Although the government alludes to the violation of "numerous federal criminal provisions," (GPHM at 23), with regard to the MacPherson sales, the government's principal allegation is that in providing the MacPherson opportunity to portfolio managers, Milken violated the criminal provisions of the Investment Company Act of 1940. 15 U.S.C.A. § 80a–17(e)(1), 80a–48 (1981). The relevant section of the Act, § 17(e)(1) provides that:

"It shall be unlawful for any affiliated person of a registered investment company, or any affiliated person of such person—

acting as an agent, to accept from any source any compensation [other than salary] for the purchase or sale of any property to or for such registered company or any controlled company thereof, except in the course of such person's business as an underwriter or broker."
15 U.S.C. § 80a–17(e)(1) (1981).

In this case, the parties each submitted expert valuations of the precise valuation of the warrants at the time they were allocated to the MacPherson partners. *Compare* GX 96, 110 *with* DX 131, 132. The court need not resolve this battle of experts. Section 17(e)(1) requires only that the affiliated person believe that the gratuity he has received constitutes "something of value" at the time he received it. *United States v. Deutsch*, 451 F.2d 98, 108 (2d Cir.1971), *cert. denied*, 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972). The precise value of the gratuity in the marketplace is of little importance.

Viewed in this light, the dispute over the precise value of the MacPherson interests becomes less significant than the value the participants in the transactions themselves placed on the investment at the time. The record contains ample evidence that the MacPherson partnership interests were valued highly by the participants. Benalder Bayse, for example, testified that the potential upside of the investment more than outweighed the downside risk. He also testified to his delight upon learning of his admission to the exclusive club of MacPherson investors. (Tr. 626, 627). Ammon testified that KKR viewed the SCI equity as "quite valuable." (Tr. 794). Further, the fact that the equity was used to "sweeten" the attractiveness of the securities to potential customers indicates that it was regarded as something of value. (Tr. 795–96, [Ammon] ).

Section 17(e)(1) requires that the affiliated person receive the compensation "for the purchase or sale" of property to or for the registered company. In *Deutsch*, the Court rejected the notion that § 17(e)(1) requires the recipient of the compensation to take any action as a result of receiving it, and read the statute to mean "that an offense under § 17(e)(1) is complete when the compensation is delivered and received with the forbidden intent." 451 F.2d at 109. "The requisite intent under § 17(e)(1) is intent to give and accept a gratuity in appreciation of past, or in anticipation of future conduct." *Id.* at 113. Bayse and Grassgreen both acknowledged their understanding of the connection between their receipt of MacPherson interests and the fact that they had directed business (including purchases of various securities in the Storer financing) to Drexel and could do so again in the future. (Tr. 625–26, 1131). Grassgreen's understanding was that Milken offered him an opportunity to participate in MacPherson for three reasons: "my historical relationship with Drexel, we were in the Storer deal, and my continued relationship with Drexel." (Tr. 1131). In addition, the objective evidence supports the notion of a link between those institutions that bought the PIK Preferred

In the end, however, the risk proved worthwhile. Holders of the warrants profited handsomely from their investment. Lowell and Michael Milken together reaped a gain of approximately $172 million from their MacPherson interests. The fiduciaries of Fidelity, First Investors, and Kindercare each reaped hundreds of thousands of dollars. (*See* GSM at 183–184). Nonetheless, the court agrees with defendant that hindsight cannot be the guide in measuring the value of the warrants at the time they were allocated.

and the individuals who purchased Mac-Pherson interests. The institutions whose fiduciaries purchased MacPherson partnership interests held approximately $175 million worth of the Preferred—more than 67% of the total—as of December 9, 1985, several days after the close of the Storer transaction.

It thus appears that in accepting Mac-Pherson partnership interests, several employees of Drexel clients violated the Investment Company Act. Finding such a violation in the context of this hearing is of little utility, however, unless Michael Milken bears responsibility for the wrongdoing. As has been the case with several other government allegations during this hearing, the record contains little *direct* evidence linking Milken to wrongdoing in connection with the sale of MacPherson partnership interests to fiduciaries of Drexel clients and customers.

Much of the evidence the government highlights to support its allegations is circumstantial in nature. For example, the government points to Milken's role as a major investor in MacPherson, a fact neither party contests, as indicative of his role in allocating the partnership interests to employees of Drexel clients. Dayton Investments, comprised of trusts for Lowell and Michael Milken's children, owned a 33.27% interest in MacPherson, the largest single interest. Dina Partners, the David Solomon-controlled entity through which Milken and Solomon created sham tax losses (a crime to which Milken pled guilty), held a 9.2% share in the MacPherson partnership. Indeed, nearly all the other Mac-Pherson investors had some close tie to Milken. Through their investments in Mac-Pherson, Milken, his family and his associates accounted for 82% of the SCI Equity available.

However, investment in the partnership—even a significant investment—standing alone, does not suffice to link Milken to any illegality. Only one witness testified that he spoke with Milken regarding the MacPherson investment. Richard Grassgreen, Chief Operating Officer of Kindercare, a major Drexel client, testified that after Milken offered him SCI warrants, Grassgreen inquired as to whether Milken intended the offer for him personally or for Kindercare. According to Grassgreen, Milken responded that the MacPherson opportunity "was for you and Perry [Mendel]," then chairman and chief executive of the company, and that the opportunity was not available for Kindercare. (Tr. 1129). On this point, however, I do not find Grassgreen's testimony wholly credible. Grassgreen stole almost $600,000 in fees from Kindercare without the knowledge of Milken or Drexel. (Tr. 1122). There is little reason for him to have suggested to Milken that the warrants should go to the company, or to have sought Milken's blessing to take the warrants himself, at the same time he was secretly diverting fees into his own pocket.

The government also attempted to link Milken to wrongdoing in conjunction with the sale of MacPherson interests through the testimony of Craig Cogut, a lawyer who did nearly all his work for Drexel and related entities and was involved in structuring the MacPherson partnership. Cogut's testimony arguably implicated Milken in two separate instances. First, Cogut testified that offering MacPherson interests to individual fiduciaries of Drexel clients, rather than to the institutions they represented, concerned him. (Tr. 902–03). After questioning Lowell Milken twice about these concerns, Cogut testified, "Lowell indicated to me that he had checked with Michael, and Michael assured him that these investment opportunities had been offered to the institutional clients and that these people were responsible and they would be checking with their advisers to make sure it was appropriate." (Tr. 905). If Michael Milken did have this conversation with Lowell Milken, it would stand as evidence of his knowledge of and involvement in the allocation of MacPherson interests. Cogut's account, however, consists of double hearsay; he is recounting to the court what Lowell Milken told him Michael Milken had said. Although the law allows me to consider hearsay evidence in the context of a *Fatico* hearing if I find it sufficiently reliable, I find Cogut's account

of this conversation between Lowell Milken and Michael Milken insufficiently reliable to credit.

The second instance where Cogut arguably implicated defendant was during his testimony about the general division of labor in the High Yield Department. In response to questioning about who determined the allocation of equity kickers in connection with leveraged buyouts, Cogut stated that "I think generally it was some combination of the syndication group, Lowell, Michael, and maybe other people in the department." (Tr. 863). Although this statement comes closer than any other piece of evidence to linking Milken to the improper sale of MacPherson interests to fund managers, I find it too vague to serve as the basis for enhancing a criminal sentence.

The sale of MacPherson partnership interests to fiduciaries of Drexel clients and customers appears to have violated the Investment Company Act. I find, however, that the record contains insufficient evidence linking Milken to this wrongdoing, and thus I will not take the MacPherson allegations into consideration for sentencing purposes.

## IV. *Wickes Corporation*

█ The testimony of Cary Maultasch and Michael Davidoff, which the court found credible, establishes that Mr. Maultasch committed the serious crime of violating Section 9(a)(2) of the Exchange Act of 1934, 15 U.S.C.A. § 78i(a)(2) (1981), by manipulating the price of Wickes common stock on April 23, 1986, which he accomplished by causing Michael Davidoff to place repeated orders for that stock; Maultasch caused Davidoff to place orders totalling 1.9 million shares of Wickes common stock in the last 19 minutes of the trading day, until Wickes common stock closed at 6⅛ that day. (Tr. 40–45 [Davidoff]). The rise of the stock price above this threshold level allowed Drexel's client Wickes to achieve its goal of ceasing to pay high dividends to owners of Wickes preferred stock (for Wickes to cease to pay those dividends, Wickes common stock had to close at or above 6⅛ on twenty out of thirty consecutive days; April 23 was the twentieth out ot thirty consecutive days). In manipulating the price of Wickes common stock, Mr. Maultasch (1) achieved the goal of an associate of Michael Milken's, Wickes Chief Executive Officer Sanford Sigoloff (*see* Tr. 398 [Harch]), (2) assured that Michael Milken's High Yield Bond Department would receive a $2.3 million standby fee from Wickes (GX 19, 20), and (3) made use of a relationship that Michael Milken had earlier established with Ivan Boesky pursuant to which Michael Milken effected the other unlawful transactions with Mr. Boesky to which Michael Milken pled guilty. (Tr. 92–100, 179, 200 [Maultasch]; Plea Agreement; Paul, Weiss letter to the court of 9/26/90). Mr. Maultasch committed this crime at the direction of Peter Gardiner. (Tr. 90 [Maultasch]).

Although the evidence referred to above might be enough to convince a fact-finder in a civil case that Michael Milken should be held responsible for any damage caused by the manipulation, it is not enough evidence to permit this court to find Michael Milken personally responsible for the Wickes manipulation in a criminal context. Nor are the following additional findings sufficient to supply the needed link to Michael Milken: (1) Michael Milken's trading assistant, Janet Chung, made a notation reflecting that Mr. Sigoloff called Michael Milken to congratulate him on April 23, 1986 (GX 15), (2) Mr. Maultasch would not have engaged in this manipulation had he not assumed it had Michael Milken's backing, if not direction (Tr. 197–98 [Maultasch]), and (3) Peter Gardiner was too low-level an employee to direct the manipulation without believing that he had Michael Milken's backing (Tr. 228–236 [Gardiner]), (GX 201).

Peter Gardiner, who might well be in a position to supply the missing link, not only has, by his own admission, twice previously lied under oath (Tr. 262–63, 271–275, 330–31 [Gardiner]), undercutting his credibility in the *Fatico* hearing, but also testified to a difficult-to-credit failure to recall the critical facts of whether he repeatedly called Maultasch directing him to have Davidoff

buy Wickes, *compare* (Tr. 90–91, 136–37, 140 [Maultasch]) *with* (Tr. 256–57, 302–303, 308–309 [Gardiner]), while recalling precise details of his attempts to solicit clients to purchase Wickes and his conversations with Alan Rosenthal and Michael Milken re. Wickes that same afternoon. (Tr. 245–256). His failure to recall those key facts, coupled with his prior perjury, render it difficult to credit any of his testimony, including his statement that Michael Milken asked him late in the day to call Cary Maultasch and find out "how many Wickes we had bought." (Tr. 255).

Thus, although there is circumstantial evidence suggesting that Michael Milken was involved in the Wickes manipulation, the credible evidence of Michael Milken's involvement that is available to the court is too thin to warrant enhancing criminal penalties based on that evidence.

## V. *Caesars World*

### A. Background

The government alleges that Michael Milken unlawfully bought securities in June and July 1983 based upon material, non-public information regarding Caesars Worlds' debt-for-equity exchange in violation of § 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C.A. § 78a *et seq.*, and Rule 10b–5, promulgated thereunder. The government alleges that: (1) Michael Milken received material, inside informationl *prior* to the June 29, 1983 meeting with Caesars World officials; and (2) Michael Milken received material, non-public information *at* the June 29 meeting. The government also alleges that based on this information: (1) he traded on this information for his own account; (2) he traded on this information for Drexel's "12 Account"; and (3) he induced others, including Jim Dahl, to solicit Caesars World bonds from Drexel clients. Defendant disputes each of these allegations.

The Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) held that a fact is material for purposes of § 10(b) and Rule 10(b)–5 if there is a "substantial likelihood that the disclosure of [that] fact would

have been viewed by [a] reasonable investor as having significantly altered the 'total mix' of information...." *Id.* 108 S.Ct. at 983. The Court held that the determination of materiality is a "fact-specific inquiry" that must be judged on a case-by case basis. *Id.* 108 S.Ct. at 987–88. The Court in *Basic* held that in the merger context, whether a fact is material depends "at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Id.* 108 S.Ct. at 987, citing *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) ("*TGS*"). While *Basic* concerned sellers of stock in the merger context, this test of materiality has been applied to other situations as well. *See Hartford Fire Ins. v. Federated Dep't Stores*, 723 F.Supp. 976 (S.D.N.Y.1989) (applying *Basic*'s materiality test to failure to disclose hypothetical takeover to plaintiff-bondholders); *In re General Motors Class E Stock Buyout Sec. Litig.*, 694 F.Supp. 1119 (D.Del.1988) (applying *Basic*'s materiality test to indefinite decision by parent corporation's management to terminate subsidiary's autonomy within corporate structure). In fact, the *TGS* case, from which *Basic*'s "probability/magnitude" test was taken, did not involve merger negotiations, but rather involved the materiality of information about the company's mineral drilling results.

### B. Michael Milken's Knowledge Prior to the June 29, 1983 Meeting with Caesars World

■ Applying *Basic*'s "probability/magnitude" test to the evidence before the Court, I find that Michael Milken did not possess material, non-public information prior to the June 29, 1983 meeting with Caesars World officials. All Michael Milken knew prior to that meeting was that John Kissick, head of Drexel's West Coast corporate finance department, had set up a meeting with Caesars World "to explore some financing options with the company."

(GX 176 at 21 [Kissick's SEC testimony]). Standing on its own, knowledge that a meeting will take place and that a number of matters, each likely to have a different effect on the price of Caesars World bonds, will be discussed, amounts to little.

## C. The June 29, 1983 Meeting with Caesars World

The parties are in agreement on much of what transpired concerning the June 29, 1983 meeting. They agree, for example, that it was initiated by Drexel, and not by anyone at Caesars World. (DX 173 at 16 [Gluck SEC testimony]; GX 176 at 14 [Kissick SEC testimony]). They also agree that no one from either Caesars World or Drexel prepared any formal materials in preparation for the meeting and that the parties set no formal agenda. John Kissick told the SEC that he contacted Caesars World to "go over some financing and alternatives," to "get an update on the company's outlook and financing needs," and to introduce Drexel to Caesars Worlds' new Chairman and Chief Executive Officer, Henry Gluck. (GX 176 at 13–14). Prior to the time of the meeting, Drexel had never done a financing for Caesars World. Drexel did, however, do a substantial amount of business with other members of the gaming industry, and presumably sought to add Caesars World to its roster of clients in the industry. The parties agree that the meeting lasted approximately two hours and that Michael Milken, John Kissick, John Taylor and perhaps someone else from Drexel's corporate finance department represented Drexel (GX 176 at 23 [Kissick]) and that Henry Gluck, Caesars Worlds' Chairman and Chief Executive Officer, Stephen Ackerman, Caesars Worlds' Chief Financial Officer, and several other people represented Caesars World. (GX 176 at 26 [Kissick]; GX 177 at 9, 23 [Gluck]; GX 178 at 17, 35 [Ackerman]).

However, the parties differ in their characterizations of the meeting itself, each side pointing to different accounts of the meeting based on SEC testimony of the meeting's participants. The government offers the following account of the meeting: .

Milken learned that Caesars World was interested in increasing its equity and decreasing its outstanding debt. (GX 178 at 26 [Ackerman]). While a range of financing options were discussed at that meeting, Gluck and Ackerman expressed the greatest interest in a debt-for-equity exchange. (GX 177 at 30–31 [Gluck]; GX 178 at 36–39 [Ackerman]). Milken himself had been the leading proponent of such an exchange. (GX 178 at 38 [Ackerman]). Because Caesars World was approaching its July 30 fiscal year-end, an exchange was Caesars Worlds' only immediate financing option. (GX 177 at 26 [Gluck]; GX 178 at 41 [Ackerman]).

(Government Letter to the Court, dated November 13, 1990, at 3).

By the end of th[e] meeting, Caesars World had focused on a debt-for-equity swap as an attractive financing proposal. (GX 177 at 30–31 [Gluck]; GX 178 at 36–38 [Ackerman]).

(GPHM at 30).

Defendant offers the following version of the meeting:

[T]he meeting was 'purely exploratory' (DX 172, p. 44 [Ackerman]); the exchange offer was but one of '15 or 20 types of options' discussed (DX 171, p. 29 [Kissick]); no 'particular option [was discussed] in more detail that the other[s]' (*Id.*, p. 30); no 'consensus developed ... concerning what would be the best type of financing' (DX 173, pp. 30–31 [Gluck]); and 'it was left that [Caesars World] would get back to [Drexel] if [Caesars World] had any interest in following up.' (DX 171, p. 31 [Kissick]).

(DPHM at 29).

Given the parties' choice not to offer live testimony by any of the meeting's participants, the court makes no judgment concerning the credibility of these participants' SEC testimony. (*See* Tr. 1163 [John Carroll]). After reading the testimony, the court finds that the parties' differences are largely ones regarding what inferences each drew from what transpired, rather

than ones regarding what actually transpired.

Stephen Ackerman, in his testimony, indicates that by the end of the meeting the Caesars World participants found the exchange offer proposal quite attractive:

> I think we expressed the view in the meeting that that type of financing appeared to have merit for Caesars World.... If I recall the meeting, I think several people, including myself, expressed the opinion that it had merit for us ... [no other possibilities were officially excluded but] as a practical matter, some of the disadvantages of them were prominent, and it led us, after hearing the 3A9 [exchange offer] idea, to focus much more on doing that type of transaction.... I think it was our view, at that point in time, that that particular type of transaction was better suited to our needs than any other type.

(GX 178 at 40–41). While Ackerman's testimony indicates that he *expressed* the view that the exchange offer idea was attractive, and that he thinks he *held* the view that it best suited the company's needs, he does not state that he *expressed* the view that an exchange offer was more attractive than other options.

John Kissick testified that he left the meeting unsure of Caesars Worlds' intentions:

> We discussed many options, including debt financing, mortgage financing, convertible bonds, bond warrants, exchange offers and common stock offerings.... I have attended over 100 meetings like this with Michael Milken and it is not Mr. Milken's style to stress any one option. At no time during the meeting were any decisions made as to what, if anything, the company intended to do.... I ... had no reason to believe when I left that meeting that we would do any transaction with Caesars World, let alone an exchange offer.

(DX 166 at 2, [Kissick Affidavit] ).

Caesars Worlds' Chairman and Chief Executive Officer, Henry Gluck, stated in his SEC testimony that the meeting was "more exploratory in nature:"

> [T]hat meeting [was] more exploratory in nature ... I think probably that meeting was probably *too early for any consensus to have developed* ... We still had two investment bankers, other investment bankers, very much involved in potential equity offering; and so we had some serious considerations there as to first what was best for the company and also the delicacies of dealing with so many important people who were trying to do their job in doing what was best for Caesars; and we had to put ourselves in a position of trying to decide what was truly best for ourselves.

(GX 177 at 30–31) (emphasis added). Gluck was Caesars Worlds' top decisionmaker. His testimony indicates his uncertainty, by the end of the June 29 meeting, concerning which, if any, of the several options being urged on Caesars World would be chosen.

Given Gluck's uncertainty at the end of the June 29, 1983 meeting concerning which of the options under consideration, if any, would be chosen, I find that by the end of the meeting the probability of Caesars World doing an exchange offer, or any other particular transaction, was not high enough for information gained at that meeting to be material under the *Basic* test. Michael Milken thus did not receive material, non-public information at the June 29 meeting.

I also find that there is no evidence that Milken received any additional information about Caesars Worlds' intentions between the time of the meeting and the announcement of the exchange offer on July 15, 1983. Thus, I am unable to find that Michael Milken traded on material, non-public information in violation of § 10(b) and Rule 10b–5.

### D. Michael Milken's Offer to Prescott Crocker

 The government alleges that Michael Milken violated other laws and rules in addition to § 10(b) and Rule 10b–5 in connection with the Caesars World transaction. The government alleges that Michael Milken's offer to Prescott Crocker to "short bonds" to Colonial and "buy them

back at a premium" (Tr. 1295 [Crocker]) violated 15 U.S.C.A. § 78q(a)(1), and SEC regulations promulgated thereunder as well as industry self-regulatory rules, such as the National Association of Securities Dealers' Rule of Fair Practice, Article III, Section 19(e) ("NASD Rules"), New York Stock Exchange ("NYSE") Rules 352(b) and (c), and NYSE Rule 476, and American Stock Exchange ("ASE") Rule 390; and Drexel internal policies.

In his testimony at the *Fatico* hearing, Prescott Crocker testified that on July 18, 1983, he called Jim Dahl to complain about the swap Dahl had arranged for him involving Caesars World and Texas International bonds and to accuse Drexel of having inside information at the time it handled the swap. (Tr. 1293 [Crocker]). Crocker testified that Jim Dahl called him back and said that Michael Milken would like to talk to him. (*Id.*). According to Crocker, Michael Milken said,

['']on this issue of Caesars World, Pres, I don't know where you are coming from in terms of charging us with inside information. We had nothing to do with this investment banking relationship, we had no knowledge of this exchange offer ... look, I'm short the bonds and I have to deliver the bonds.[']

Crocker then testified,

I said, Michael, go in and buy them in the secondary market. He said, [']I can't do that because I am restricted.['] Then, in recognizing that there was an opportunity loss that I felt I had been exposed to, he said, [']we'll make it up to you and we'll make it up to you by shorting bonds to you in the future and over time buying them back at premium bids and we will make up the difference as you and I agree.['] My response was just to remain silent to Michael or state to Michael [that he should talk to Colonial's in-house counsel].

(Tr. 1293–94). Crocker reiterated, "[']He [Michael Milken] said, Pres, we'll make it up to you in the future. We'll short bonds to you and buy them back at a premium.[']" (Tr. 1295). When asked whether Michael Milken had indicated any specific bond,

Crocker stated, "No. But he was making reference to bonds traded in the secondary marketplace." (Tr. 1295–96). They did not discuss how much of Crocker's loss Michael Milken would be willing to compensate. (Tr. 1296 [Crocker]). Crocker continued,

He [Michael Milken] called me back later that afternoon and said that he would reconsider canceling the trade, that he regretted the mistake or that I had mistaken what was going on, and that our relationship, customer relationship was compromised, and that he would consider his steps, which would be to perhaps buy the bonds in the secondary market or take in other steps, but he would get back to me on the following day to see what he had decided, what he was going to do for the firm.

(*Id.*). Crocker testified that Jim Dahl called him back on the following day and said that he and Milken had accepted that Colonial would break the Caesars World/Texas International trade. (Tr. 1296–97). After this episode, Crocker continued his relationship with Drexel and Michael Milken, although he asked Jim Dahl to have himself removed from Colonial's account. (Tr. 1297–1298 [Crocker]).

On July 18, 1983, Crocker wrote a memorandum memorializing his dealings with Drexel involving his sale of Caesars World bonds, which included the passages:

*3:15 p.m., 7/18/83*

Mike Milkin [sic] came to the phone and stated flatly that there was no inside information involved, that my timing as a seller was unfortunate, that Drexel had acted as agent and that his buyer would not cancel the trade. Tough luck! However, he did offer to compensate CHYS [Colonial] for its 'losses' (to be negotiated) by shorting bonds to us and buying back at higher levels. Milkin then said he was restricted and couldn't make markets in the bonds. I replied that we should stand buy [sic] and wait.

*4:15 p.m., 7/18/83*

Milkin called to say that he would know tomorrow if Drexel could cancel our trade. He then stated that he would be

shorting bonds to the buyer and might like to buy our bonds to cover. (GX 167).

In his testimony at the hearing, Crocker explained these entries:

Both Jim and Michael were well aware that I had sensed that I had experienced an opportunity loss here, that I had been taken advantage of, and that there was an identifiable, calculable opportunity loss to the fund. In this manner, as I described here, Michael proposed that he would compensate the fund for that loss through the practice over time of trading, selling and buying, bonds at above market or below market prices.

(Tr. 1300). Crocker testified that he did not do these trades because, "[t]hat is an irregular practice and it is perhaps illegal, and it is certainly not necessary." (*Id.*) Crocker explicitly rejected the suggestion by defense counsel that Michael Milken in his offer to "short bonds to Colonial" was referring to Caesars World bonds (Tr. 1304), and testified that Michael Milken said, "[']Pres, I realize you have some losses here, I know it is upsetting to you, we'll make them up.[']" Crocker characterized Milken's offer as dealing with "[t]wo unrelated subjects, talking about trades in secondary bonds over a duration in time in the future." (Tr. 1305).

### 1. Alleged Legal Violations

The government alleges that Michael Milken's offer to Crocker violated several laws and regulations, including 15 U.S.C.A. § 78q(a)(1), and SEC regulations promulgated thereunder. Each of the provisions cited by the government is a record-keeping requirement, prescribing that records be kept which accurately reflect a broker-dealer's purchases and sales. The government argues that if Michael Milken and Prescott Crocker had consummated the transaction that Milken proposed, Milken would have kept false records of this transaction. This is speculation. Although Michael Milken pled guilty to the same type of disclosure violations with respect to his dealings with the Boesky organization, the court cannot presume in a criminal context

that Michael Milken would have engaged in the same type of illegal nondisclosure with Crocker, even though the likelihood of a disclosure would appear to be highly remote. Thus, I find no legal violation in Michael Milken's offer to Crocker.

### 2. Industry Self–Regulatory Rules

The Government also alleges that Michael Milken's proposal to Crocker violated the rules of industry self-regulatory organizations to which Drexel belonged, such as the National Association of Securities Dealers' Rule of Fair Practice, Article III, Section 19(e) ("NASD Rules"), New York Stock Exchange ("NYSE") Rules 352(b) and (c), and NYSE Rule 476, and American Stock Exchange ("ASE") Rule 390. These rules forbid a member organization or a person associated with a member from guaranteeing a customer against loss, or guaranteeing a customer a profit in a transaction.

As part of this dispute over the question of whether Milken violated industry rules, the parties dispute the meaning of Michael Milken's offer to Crocker. The government points to Crocker's understanding that Michael Milken's offer to "short bonds to [Colonial] and buy them back at a premium" (Tr. 1295) was not an offer to retrade *Caesars World* bonds, but rather was an offer to repay Colonial through pre-arranged trades involving *other* bonds. (Government letter to the Court, dated November 13, 1990, at 10). Defendant contests this argument by urging an alternative interpretation of Michael Milken's offer. According to defendant, Michael Milken was proposing to "in effect, cancel the trade ... to short Caesars World bonds to Colonial at the pre-exchange offer announcement price, and then buy back the bonds at the then prevailing (higher) market price, but only at a time when he was no longer restricted from doing this." (Paul, Weiss letter to the Court, dated November 14, 1990, at 28, 30).

It is unnecessary to decide whether Michael Milken was referring to Caesars World bonds in his offer to Crocker, because without a consummated transaction,

it is impossible for the court to ascertain whether Milken's handling of it would have violated industry self-regulatory rules. Thus, I find that Michael Milken did not violate industry self-regulatory rules in his offer to Prescott Crocker.

### 3. Drexel Policies

Drexel Policy Memorandum, dated September 21, 1982, defines as "unacceptable conduct:"

> any purchase or sale transaction or series of transactions coupled with an agreement, arrangement or understanding directly or indirectly to reverse such transaction or series of transactions or limit the risk of either party to the transaction which would violate the securities acts or rules of self regulatory organizations (*i.e.*, commonly known as "prearranged trading").

(GX 77 at 5). Because I find that Michael Milken's offer did not violate securities acts or rules of self-regulatory organizations, I find that it did not violate Drexel policy.

SO ORDERED.